## AFFIDAVIT

I, Timothy Hoffmann, being sworn, depose and state as follows:

### Introduction and Agent Background

1) I am a Special Agent (SA) with the Drug Enforcement Administration (DEA). I am assigned to the DEA's Burlington Resident Office (BRO). I was hired as a SA with DEA in 2012, and I completed my training in 2013. In connection with my duties and responsibilities as a SA, I have received extensive training in the field of narcotics investigation and enforcement. I have received training, both formal and informal, in the investigation of violations of controlled substance offenses, including attending several schools regarding general narcotics investigation. I completed the DEA Basic Agent Training Academy, located in Quantico, Virginia. I have also received specialized training related to the investigation of money laundering and other financial crimes related to drug trafficking. I have also participated in investigations relating specifically to the possession and distribution of heroin and cocaine base, the drugs involved in this investigation and discussed herein. I have also participated in various aspects of investigatory work, including but not limited to undercover surveillance and undercover narcotics purchases, and I have participated in several narcotics-related arrests and the execution of many narcotics-related search warrants. I have written affidavits in support of search and arrest warrants, and I frequently utilize the services of informants and other confidential sources of information.

2) I make this affidavit in support of an application for a criminal complaint charging Terrence Collins (date of birth XX/XX/1988), Shanazz Collins (date of birth XX/XX/1997), and Brandon Blanks (date of birth XX/XX/1985) each with Knowingly and Intentionally Conspiring to Distribute and Possess with Intent to Distribute Controlled Substances in violation of Title 21, United States Code, Sections 846, 841(a), and 841(b)(1)(B). Based on the facts set forth in this

affidavit, I respectfully submit there is probable cause to believe that each named suspect actually possessed a quantity of controlled substances in excess of a personal-use amount, that each defendant knowingly possessed the substance, that each defendant knew it was a controlled substance, and that they were working together to transport it to Vermont for distribution.

3) The information contained in this affidavit comes from my personal observations and knowledge, my training and experience, and information obtained from other agents, law enforcement personnel, and witnesses. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the requested criminal complaint, I have not included each and every fact known to me concerning this investigation.

## SUMMARY OF INVESTIGATION

4) In September 2018, Burlington Police Department (BPD) Detective Stoughton and Det. Philip Tremblay spoke with a subject who was interested in providing information and cooperating with law enforcement. For ease of reading and confidentiality purposes this cooperating subject will be referred to as the pseudonym "CS1" as well as the pronoun "it". CS1 was advised that it could face criminal charges if it provides any false information to law enforcement. The subject entered into a Cooperating Subject agreement with the Burlington Police Department and agreed to provide active cooperation in exchange for monetary compensation.

5) CS1 had previously completed controlled purchases for BPD, which led to multiple arrests of individuals in Vermont State Court. CS1 has criminal convictions for the following offenses: Buy, Receive, Sell, Possess, Conceal Stolen Property $900 or less; Violation of Conditions of Release; Burglary; Identity Theft; Grand Larceny; Fraud – Credit Card Use; Assault – Simple; Forgery – Utter/Publish an Instrument; Non-Controlled Drug – Sell as Controlled; Burglary – Occupied Dwelling.

6) CS1 advised that it was in a position to purchase "crack" cocaine and heroin from a male it knew as "Bobby." CS1 advised it did not know any other name for "Bobby" and described "Bobby" as a black male with a stocky build who drove a dark-colored Lexus with a Massachusetts registration. CS1 provided a phone number for "Bobby," which was 413-507-7631, and stated that it had previously purchased "crack" cocaine and heroin from "Bobby."

**Controlled Purchase #1**

7) On a known date during the week of September 2, 2018, CS1 met with Detective Stoughton and Detective Tremblay at the Burlington Police Department and advised it was in a position to purchase "crack" cocaine from "Bobby." CS1 was searched prior to the drug transaction, at which time it was found to have no illegal drugs, paraphernalia, or large sums of money on its person. CS1 was provided enough serialized US currency to complete the anticipated drug transaction.

8) At the direction of Detective Tremblay, CS1 contacted "Bobby" via phone calls to 413-507-7631 to arrange the drug transaction. "Bobby" agreed to meet CS1 at a known location in Burlington, Vermont—a location within the District of Vermont. Investigators established surveillance of the area where the drug transaction was expected to be conducted.

9) CS1 was transported to the area by Detective Stoughton and Detective Tremblay. CS1 was kept under surveillance by investigators as it arrived and traveled to the area of the anticipated meet location. Investigators observed CS1 arrive in the area of the meet location, but the physical meeting between CS1 and "Bobby" was not directly observed by investigators. CS1 was out of investigators' sight for approximately 3 minutes.

10) A dark-colored Lexus sedan bearing Massachusetts registration 8NJ198 was observed by Sergeant Merchand leaving the area of the meet location immediately following the controlled

3

purchase. A query with Department of Motor Vehicles showed the vehicle to have been registered to Jhoridee Liliana Davis who had a listed address in Springfield, Massachusetts.

11) CS1 was monitored as it returned to the investigators' location. Upon returning, CS1 immediately handed Detective Tremblay a known amount of a white, rock-like substance that was consistent with the appearance and texture of "crack" cocaine. Detective Stoughton and Detective Tremblay then transported CS1 back to a known location where CS1 was searched and was found to have no illegal drugs, paraphernalia, or large sums of money.

12) Following the controlled purchase, Detective Tremblay conducted an audio-recorded statement with CS1 regarding the drug transaction with "Bobby." CS1 advised that it met with "Bobby" and it physically exchanged the US currency provided by investigators for the "crack" cocaine. CS1 stated that "Bobby" was within a dark-colored Lexus when the exchange took place.

13) Back at the Burlington Police Department, Detective Tremblay field-tested the suspected "crack" cocaine using a NARK II Cocaine ID Swipe, which tested presumptively positive for the presence of cocaine. The suspected "crack" cocaine was tagged into evidence at the Burlington Police Department, tag number 61551.

**Controlled Purchase # 2**

14) On a known date during the week of September 16, 2018, CS1 met with Detective Stoughton and Detective Tremblay at the Burlington Police Department and advised it was in a position to purchase "crack" cocaine and heroin from "Bobby." CS1 was searched prior to the drug transaction, at which time it was found to have no illegal drugs, paraphernalia, or large sums of money on its person. CS1 was provided enough serialized US currency to complete the anticipated drug transaction.

15) At the direction of Detective Tremblay, CS1 contacted "Bobby" via phone calls and text messages to 413-507-7631 to arrange the drug transaction. "Bobby" agreed to meet CS1 at a known location in Burlington, Vermont. Investigators established surveillance of the area where the drug transaction was expected to be conducted.

16) CS1 was transported to the area by Detective Stoughton and Detective Tremblay. CS1 was kept under surveillance by investigators as it arrived and traveled to the area of the anticipated meet location of the controlled purchase. Investigators observed CS1 arrive in the area of the meet location, but once again the physical meeting was not directly observed by investigators. CS1 had been equipped with audio/video equipment, however, and investigators later reviewed the captured footage that showed a male meeting with CS1.

17) CS1 was monitored as it returned to investigators' location. Upon returning, CS1 immediately handed Detective Tremblay a known amount of a white, rock-like substance that was consistent with the appearance and texture of "crack" cocaine. CS1 also handed Detective Tremblay white-colored wax folds held together by a black rubber band; based on my training and experience, I recognize that to be common packaging for heroin. Detective Tremblay advised me that the wax folds appeared to contain powder within them.

18) Investigators maintained surveillance on the area of the meet location and observed a vehicle of interest—a blue-colored Toyota Rav 4 that was later determined to be bearing Connecticut registration AP61798 and to be a rental vehicle owned by Enterprise Rental Car. It had been rented by Jhoridee Davis, the same individual to whom the vehicle from Controlled Purchase #1 was registered.

19) Detective Stoughton and Detective Tremblay transported CS1 back to a location where CS1 was searched and was found to have no drugs, paraphernalia, or large sums of money.

20) Following the controlled purchase, Detective Tremblay conducted an audio-recorded statement with CS1 regarding the drug transaction with "Bobby." CS1 advised that it met with "Bobby" and that it physically exchanged the currency provided by investigators for the "crack" cocaine and heroin. CS1 stated that "Bobby" was within a blue-colored Toyota Rav4 with a Connecticut registration during the exchange.

21) Back at the Burlington Police Department, Detective Stoughton field-tested the suspected "crack" cocaine using a NARK II Cocaine ID Swipe, which tested presumptively positive for cocaine. Detective Stoughton also field-tested the suspected heroin using a NARK field test kit. The heroin field test was inconclusive, and the substance is pending further testing. The "crack" cocaine was tagged into evidence at the Burlington Police Department, tag number 61796. The suspected heroin was tagged into evidence at BPD, tag number 61797.

**Controlled Purchase #3**

22) On a known date during the week of October 28, 2018, CS1 met with Detective Stoughton and Detective Tremblay at the Burlington Police Department and advised it was in a position to purchase "crack" cocaine and heroin from "Bobby." CS1 and its property were searched prior to the drug transaction, and CS1 was found to have no illegal drugs, paraphernalia, or large sums of money. CS1 was provided enough serialized US currency to complete the anticipated drug transaction.

23) At the direction of Detective Tremblay, CS1 contacted "Bobby" via phone call to 413-507-7631 to arrange the drug transaction. "Bobby" agreed to meet CS1 at a known location in Burlington, Vermont—a location within the District of Vermont. Investigators established surveillance of the area where the drug transaction was expected to be conducted.

24) CS1 arrived to the area of the anticipated meet location of the controlled purchase. CS1 was observed by investigators as it traveled to the area of the meet location. Investigators observed CS1 arrive in the area of the meet location, but the physical meeting was not observed by investigators. CS1 was out of investigators' sight for approximately 1 minute.

25) CS1 was monitored until it met up with investigators at a known location. Upon meeting with investigators, CS1 immediately handed Detective Tremblay a known amount of a white, rock-like substance with an appearance and texture that were consistent with "crack" cocaine. CS1 also handed Detective Tremblay white-colored wax folds held together by a black rubber band; the folds appeared to contain powder within them. CS1 was searched again and was found to have no illegal drugs, paraphernalia, or large sums of money.

26) Following the controlled purchase, Detective Tremblay conducted an audio-recorded statement with CS1 regarding the drug transaction with "Bobby." CS1 advised that it met with "Bobby" and that it physically exchanged the known amount of currency provided by investigators for the "crack" cocaine and heroin. CS1 stated that "Bobby" was within a Ford Edge with a New York registration during the exchange.

27) Investigators had maintained surveillance on the area of the meet location and observed a vehicle of interest (bearing New York registration JBY6123) leaving the area immediately following the controlled purchase. The vehicle was later determined to be a rental vehicle through Enterprise Rental Car that had been rented by Kendrick Blackwell (DOB XX/XX/1991), who had a listed address in Springfield, Massachusetts. Enterprise Rental Car advised that Blackwell had provided a contact phone number of 413-250-0346. A review of the records for "Bobby's" 413-507-7631 number indicate approximately 53 contacts between Bobby's phone

number and Blackwell's phone number (413-250-0346) between August 31 and September 23, 2018.

28) Back at the Burlington Police Department, Detective Tremblay field-tested the suspected "crack" cocaine using a NARK II Cocaine ID Swipe, which tested presumptively positive for cocaine. Detective Tremblay also field-tested the suspected heroin using a NARK field test kit, which tested presumptively positive for heroin. Both the "crack" cocaine and heroin were tagged into evidence at the Burlington Police Department, tag number 62354.

**Controlled Purchase #4**

29) On November 9, 2018, under case number 2:18-mj-154, I received a Search Warrant from the United States District Court for the District of Vermont for location data associated with cellular phone number 413-507-7631, the phone previously used by "Bobby." On November 12, 2018, based on GPS location data for 413-507-7631, I located a Hyundai SUV bearing Illinois registration ZX94392. I observed the vehicle to be occupied by two (2) black males in the area of Hildred Drive, Burlington, Vermont.

30) On a known date during the week of November 11, 2018, CS1 met with Detective (Det.) Stoughton and Det. Tremblay at the BPD and advised it could purchase "crack" cocaine and heroin from "Bobby." CS1 and its property was searched prior to the drug transaction, and it was found to have no illegal drugs or large sums of money. CS1 was provided enough serialized US currency to complete the anticipated drug transaction.

31) At the direction of Det. Tremblay, CS1 contacted "Bobby" via phone call to 413-507-7631 to arrange the drug transaction. "Bobby" agreed to meet CS1 at a known location in Burlington, Vermont. Investigators established surveillance of the area where the drug transaction was expected to be conducted.

32) CS1 arrived in the area of the anticipated meet location of the controlled purchase. CS1 was observed by investigators as it traveled to that area. Prior to the controlled purchase, GPS data location of 413-507-7631 showed the phone in the area of Hildred Drive, Burlington, Vermont. BPD Sgt. Daniel Merchand drove to the area and located a Hyundai SUV bearing Illinois registration ZX94392 in the vicinity of where the GPS data indicated.

33) Investigators observed CS1 arrive into the area of the meet location, although the physical meeting was not observed by investigators. CS1 was out of investigators' sight for approximately 3 minutes.

34) Following the meet, CS1 was monitored until it met up with investigators at a known location. As CS1 was driving from the meet location it stated the following: "ZX94392. ZX94392 Illinois." Upon meeting with investigators, CS1 provided Det. Stoughton a known amount of a white rock like substance, which was consistent with "crack" cocaine based on my training and experience. CS1 also provided Det. Stoughton white colored wax folds held together by a black rubber band, which I am familiar with from my training and experience as common packaging for heroin. The wax folds appeared to contain powder within them.

35) Det. Stoughton and Det. Tremblay met with CS1 at a known location following the controlled purchase. CS1 and its property was searched and was found to have no illegal drugs, paraphernalia or large sums of money.

36) Following the controlled purchase, Det. Tremblay conducted an audio recorded statement with CS1 regarding the drug transaction with "Bobby." CS1 advised that it met with "Bobby," and it physically exchanged the known amount of provided US currency for the "crack" cocaine and heroin. CS1 stated that "Bobby" was within a beige colored SUV bearing Illinois registration during the exchange.

37) Investigators maintained surveillance on the area of the meet location and observed the beige Hyundai SUV (bearing Illinois registration ZX94392) leaving the area immediately following the controlled purchase. This was determined to be a rental vehicle through Enterprise Rental Car, and was rented under the name Kendrick BLACKWELL (DOB X/XX/1991), who has a listed address in Springfield, Massachusetts. This is the same name under which the vehicle was rented that had been used during controlled purchase #3.

38) Back at the Burlington Police Department, Det. Tremblay field-tested the suspected "crack" cocaine using a NARK II Cocaine ID Swipe, and it tested presumptive positive for cocaine. The cocaine was tagged into evidence at the Burlington Police Department, tag number 62548. Det. Tremblay also field-tested the suspected heroin using a NARK field test kit, and it tested presumptive positive for heroin. The heroin was tagged into evidence at the Burlington Police Department, tag number 62549.

**Arrests on November 14, 2018**

39) On November 14, 2018, I was monitoring the location data of 413-507-7631 and determined the cellular phone was travelling south through Vermont. I contacted the Massachusetts State Police (MSP) and requested troopers attempt to locate the Hyundai SUV and conduct a traffic stop if they observed any traffic infractions.

40) On Interstate 91, in the Town of Whately, Massachusetts, MSP Trooper Robert Berrena observed the Hyundai SUV bearing IL regulation ZX94392 committing a motor vehicle infraction. Trooper Berrena subsequently initiated a motor vehicle stop on the aforementioned vehicle. Also present was Trooper Edward Bullock of MSP.

41) Trooper Berrena identified the driver of the vehicle as Torrian MCLEAN, and the passenger identified himself as Walter JONES. Upon further investigation, the passenger was

identified as Terrence COLLINS. Upon the request of MSP, MCLEAN and COLLINS each consented to a search of his persons. During the search of MCLEAN, Trooper Bullock located $1,108.00 U.S. Currency on his person. During the search of COLLINS, Troopers Berrena and Bullock located $5,170.00 U.S. Currency on his person. Both MCLEAN and COLLINS were found to have active State of Massachusetts arrest warrants, and they were arrested on the warrants.

42) Following the arrest of COLLINS and MCLEAN, I provided Trooper Steven Hean with a photograph of the BPD-recorded buy money utilized to conduct controlled purchase #4. I had received a photograph of the recorded buy money from Det. Tremblay. MSP inspected the U.S. Currency seized from COLLINS and MCLEAN. Of the $1,108.00 U.S. Currency located on MCLEAN, $40 consisted of recorded money used during controlled purchase #4. Of the $5,170.00 U.S. Currency located on COLLINS, $100 consisted of recorded money used during controlled purchase #4.

43) The aggregated seized U.S. Currency totaled $6,138. On November 15, 2018, SA Kevin Kadish and Task Force Officer (TFO) Chris May met with MSP in Springfield, MA and took custody of the monies seized from MCLEAN and COLLINS.

**Controlled Purchase #5**

44) On a known date during the month of November 2018, Det. Tremblay and I spoke with a subject who was interested in providing information and cooperating with law enforcement. For ease of reading and confidentiality purposes, this cooperating subject will be referred to as the pseudonym "CS2" as well as the pronoun "it". CS2 was advised that, if it provides any false information to law enforcement, it could face criminal charges. The subject entered into a

11

Cooperating Subject agreement with the Burlington Police Department and agreed to provide active cooperation in exchange for monetary compensation.

45) CS2 has criminal convictions for the following offenses: Cocaine – Possession, Vehicle Operation - License Suspended #1 for DUI, Vehicle Operation – License Suspended #2 for DUI, DUI #1 – Influence, DUI #2 – Influence, DUI #3 or Subsequent – Influence, DUI #3 – Influence, Vehicle Operation – License Suspended #1, Theft of Rented Property $100 or Less, and Retail Theft.

46) CS2 advised that it was in a position to purchase "crack" cocaine and heroin from a male it knew as "Bobby." CS2 advised it did not know any other name for "Bobby" and described "Bobby" as a black male with a heavier build.

47) On a known date during the week of November 25, 2018, CS2 met with Corporal Erwin and Det. Tremblay at the Burlington Police Department and advised it was in a position to purchase "crack" cocaine from "Bobby." CS2 was searched prior to the drug transaction, at which time it was found to have no illegal drugs, paraphernalia, or large sums of money on its person. CS2 was provided enough serialized US currency to complete the anticipated drug transaction. CS2 advised that "Bobby" had a new phone number. CS2 provided "Bobby's" new phone number as 203-850-3528.

48) At the direction of Det. Tremblay, CS2 contacted "Bobby" via phone call to 203-850-3528 to arrange the drug transaction. "Bobby" agreed to meet CS2 at a known location in South Burlington, Vermont. Investigators established surveillance of the area where the drug transaction was expected to be conducted.

49) CS2 arrived to the area of the anticipated meet location of the controlled purchase. CS2 was kept under video surveillance throughout the duration of the meeting.

50) Investigators observed a dark colored Volkswagen sedan arrive in the area of the meet location, although the physical meeting with CS2 was not directly observed by investigators.

51) CS2 was monitored until it met up with investigators at a known location. Upon meeting with investigators, CS2 provided Det. Tremblay with a known amount of a white rock like substance that was consistent with "crack" cocaine based on the investigators' training and experience. CS2 was searched and was found to have no illegal drugs, paraphernalia or large sums of money.

52) Following the controlled purchase, Det. Tremblay conducted an audio-recorded interview with CS2 regarding the drug transaction with "Bobby." CS2 advised that it met with "Bobby" and physically exchanged the known amount of provided US currency for the "crack" cocaine. CS2 stated that "Bobby" arrived to the area in a vehicle and that the drug transaction occurred in the vehicle.

53) Back at the Burlington Police Department, Det. Tremblay field-tested the suspected "crack" cocaine using a NARK II Cocaine ID Swipe, and it tested presumptively positive for cocaine. The suspected cocaine was tagged into evidence at the Burlington Police Department, tag number 62693.

**Controlled Purchase #6**

54) On a known date during the week of November 25, 2018, CS1 met with Det. Weinisch and Det. Tremblay at the Burlington Police Department and advised it was in a position to purchase heroin from "Bobby." CS1 and its property was searched prior to the drug transaction, at which time it was found to have no illegal drugs or large sums of money. CS1 was provided enough serialized US currency to complete the anticipated drug transaction. CS1 advised Det.

Tremblay that "Bobby" had a new phone number. CS1 provided "Bobby's" new phone number as 203-850-3528.

55) At the direction of Det. Tremblay, CS1 contacted "Bobby" via phone call to the 203-850-3528 to arrange the drug transaction. "Bobby" agreed to meet CS1 at a known location in Burlington, Vermont. Investigators established surveillance of the area where the drug transaction was expected to be conducted.

56) CS1 arrived to the area of the anticipated meet location of the controlled purchase. CS1 was observed by investigators as it traveled to the area of the anticipated meet location.

57) Det. Tremblay could hear an exchange between CS1 and "Bobby" via the "security wire," but investigators did not physically observe the meet take place. CS1 was out of investigators' sight for approximately 2 minutes.

58) Upon the completion of the controlled purchase, CS1 was monitored by investigators until it met up with Det. Tremblay at a known location. Upon meeting with investigators, CS1 provided Det. Weinisch white colored wax folds held together by a rubber band, which I am familiar with from my training and experience as common packaging for heroin. The wax folds appeared to contain powder within them. CS1 and its property was searched and was found to have no illegal drugs, paraphernalia or large sums of money.

59) Following the controlled purchase, Det. Tremblay conducted an audio-recorded interview with CS1 regarding the drug transaction with "Bobby." CS1 advised that it met with "Bobby," and it physically exchanged the known amount of provided US currency for the heroin. CS1 stated that "Bobby" was within a grey colored Volkswagen bearing a Maryland registration during the exchange.

60) It should be noted that investigators maintained surveillance on the area of the meet location and observed a Volkswagen (bearing Maryland registration 4CW8447) leaving the area immediately following the controlled purchase. The Volkswagen was determined to be a rental vehicle through Avis Rental Car; it had also been rented under the name Kendrick BLACKWELL, the same name used for the rental vehicles associated with controlled purchases #3 and #4.

61) Back at BPD, Det. Tremblay field-tested the suspected heroin using a NARK field test kit, and it tested presumptively positive for heroin. The suspected heroin was tagged into evidence at the Burlington Police Department, tag number 62697.

**Arrests on December 18, 2018**

62) On December 10, 2018, also under case number 2:18-mj-154, I received a Search Warrant from the United States District Court for the District of Vermont for location data associated with cellular phone number 203-850-3528, the phone currently used by "Bobby." On December 18, 2018, based on GPS location data for 203-850-3528, I noticed that the cell phone was traveling northbound just inside the Vermont border from Massachusetts at approximately 2:00 am. I asked other investigators to assist, and we assembled in Williston, Vermont to attempt to locate the vehicle the phone was traveling in. Near exit 3 of Interstate 89 in the vicinity of Bethel, Vermont, investigators located a Chevrolet Malibu moving consistently with the reported phone location at approximately 6:28 am. The license plate for the Malibu was registered to Enterprise Rental Car, which was consistent with the previous controlled purchases involving Collins.

63) Investigators maintained surveillance on the Malibu until the area of Williston, at which time a marked police vehicle assisted in stopping the Malibu. Once the Malibu was stopped, I

15

and other investigators approached the vehicle. Terrence Collins was driving the Malibu, and he had the cellular phone assigned call number 203-850-3528 in his hand (as verified by a later call placed to the phone). He was placed under arrest and cuffed, and Detective Tremblay located and seized approximately $1,550 in cash from Collins's pants pocket during a preliminary search. During a more thorough search at the Burlington Police Department, approximately 40 grams of a substance consistent with the appearance and texture of cocaine base (crack) was seized from Collins's jacket pocket. The suspected crack cocaine was field tested by Detective Sergeant Merchand, and it tested presumptively positive for the presence of cocaine.

64) The rear seat passenger, Shanazz Collins, was ordered out of the Malibu. Investigators observed a bulge under her coat in the vicinity of her crotch. At my direction, she removed the objects causing the bulge. The bulge had been caused by a combination of two clear knotted plastic bags containing approximately 53 grams of a chunky material consistent with cocaine base (crack) and four white stacks each containing approximately 50 glassine envelopes stamped "Exit 4" that contained a powder consistent with heroin. Detective Sergeant Merchand field tested the suspected crack, and it tested presumptively positive for the presence of cocaine. DEA investigator George Lutz field tested the suspected heroin, and it tested presumptively positive for the presence of heroin.

65) The front seat passenger, Brandon Blanks, was also ordered out of the car and placed in handcuffs. He was transported to the Burlington Police Department and searched. When Blanks was undressed, investigators immediately noticed a white-colored package protruding from his rectum. They recovered and examined the package, and it contained approximately 3.3 grams of suspected cocaine base (crack) and approximately 55 bags of suspected heroin in glassine bags

stamped with "Exit 4." Detective Sergeant Merchand field tested the suspected crack, and it tested presumptively positive for the presence of cocaine.

66) Following his arrest, I interviewed Terrence Collins, and he agreed to answer questions after receiving his *Miranda* rights. Terrence Collins confirmed that the nickname he used in Vermont was "Bobby." Terrence Collins confirmed that 413-507-7631 was his phone number at one time, and he stated that he had a new "203" number, but that he could not remember the full phone number. Terrence Collins stated that he had forty grams of crack cocaine on him at the time of his arrest; he stated that he would sell crack cocaine for at least $2400 per ounce. He also stated that he would sell heroin at approximately $80-100 per "bun," which I understood from my training and experience to be ten of the glassine baggies seized during the searches. Terrence Collins stated that the purpose of Blanks being present was to hold controlled substances and provide protection, and in exchange Collins would pay Blanks $1000. Terrence Collins stated that he had given Shanazz Collins controlled substances at the beginning of the trip from Massachusetts and that she was present to hold the substances during the trips. Terrence Collins stated that Shanazz had approximately an ounce and a half of crack cocaine and two "packs" (which he clarified to mean 100 bags) of heroin. Investigators are not aware of any familial relationship between Shanazz Collins and Terrence Collins.

67) Following her arrest, I also interviewed Shanazz Collins, and she agreed to answer questions after receiving her *Miranda* right. She claimed ownership of the controlled substances that had been seized from her. She stated that she would sell 3 "pieces" of crack for $100 and would sell heroin for $120 per bundle. She admitted to having made eight trips to Vermont, each time bringing at least 50 grams of crack and 200 bags of heroin.

17

68) As of the time of this affidavit, investigators have not had an opportunity to attempt an interview with Brandon Blanks. However, during the interview with Terrence Collins, Collins stated that he (Collins) had begged Blanks to come with him on the trip and that he was not aware that Blanks had any controlled substances on his person.

### Conclusion and Request

69) Based on the foregoing information, I respectfully submit that probable cause exists to charge Terrence Collins, Shanazz Collins, and Brandon Blanks with Knowingly and Intentionally Conspiring to Distribute and Possess with Intent to Distribute Controlled Substances in violation of Title 21, United States Code, Sections 846, 841(a), and 841(b)(1)(B). I request that the Court issue a criminal complaint charging them accordingly.

Respectfully submitted,

Timothy Hoffmann
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on December 18th, 2018.

Hon. John M. Conroy, Magistrate Judge
United States District Court
District of Vermont